UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

--------------------------------------------------------- x

UBS FINANCIAL SERVICES, INC. and    :
CITIGROUP GLOBAL MARKETS INC.,    :   Case No. 3:12c-v-424(JAG)

    :   Judge John Gibney

                   Plaintiffs,    :

    :   **MEMORANDUM**
   -against-               :   **IN OPPOSITION TO MOTION**
    :   **FOR PRELIMINARY INJUNCTION**

CARILION CLINIC,    :

    :

                 Defendant.    :

--------------------------------------------------------- x

## TABLE OF CONTENTS

**Page**

**INTRODUCTION**.................................................................................................................. 1

**OVERVIEW** ........................................................................................................................ 3

   **A.**  **Carilion's 2005 issuance of auction rate securities.** ......................................... 3

   **B.**  **The Arbitration Defendants withheld material information
and engaged in other misconduct.** .................................................................. 5

**ARGUMENT** ........................................................................................................................ 8

   **A.**  **UBS is collaterally estopped from claiming that Carilion is not
its customer based on prior decisions of the SDNY and Second Circuit
in *UBS v. WVUH*.** ............................................................................................. 9

      **1.**  **The *UBS v. WVUH* decision** ................................................................. 9

      **2.**  **Collateral estoppel bars UBS from relitigating the "customer" issue.** ............ 12

   **B.**  **Carilion's claims constitute a dispute between FINRA members
and their customer and the dispute relates to the business activities of
the FINRA members.** ...................................................................................... 14

      **1.**  **Judicial precedent, administrative precedent, and the Arbitration
Defendants' past conduct all support the conclusion that Carilion
is a customer.** ...................................................................................... 14

         *i.*   *Judicial Precedent* ...................................................................... 15

         *ii.*  *Administrative Precedent* .............................................................. 16

         *iii.*  *The Arbitration Defendants' past conduct* ....................................... 16

      **2.**  **The cases cited by the Arbitration Defendants are plainly distinguishable.** ........ 17

   **C.**  **The MSRB Rules do not compel a different result.** .................................... 18

      **1.**  **FINRA Rules apply in the municipal context.** ........................................ 19

      **2.**  **Carilion is a "customer" of UBS and Citi under the MSRB Rules.** ................ 20

474576v.1

**D.    The forum selection clause does not control here, and it is not a waiver of Carilion's right to arbitrate.** ......................................................... 22

    **1.    A forum selection clause in a single contract will not supplant an arbitration clause that covers a broader agreement.** .......................................... 23

    **2.    A waiver of arbitration must be explicit.** .................................................... 25

    **3.    The Arbitration Defendants' reading of the forum selection clause creates an unnecessary conflict.** .................................................................... 26

    **4.    Finally, the Arbitration Defendants themselves have not abided by the forum selection clause.** ......................................................................... 27

**E.    The balance of hardships does not decidedly favor the Arbitration Defendants.** ...... 28

**F.    An injunction in favor of the Arbitration Defendants would not be in the public interest.** ...................................................................................... 29

**CONCLUSION** ................................................................................................. 30

474576v.1

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bank Julius Baer & Co., Ltd. V. Waxfield Ltd.*,
   424 F.3d 278 (2d Cir. 2005)............................................................. 25, 26

*Berthel Fisher & Co. Fin. Services, Inc. v. Larmon*,
   11-cv-889 ADM/JSM, 2011 WL 3294682 (D. Minn. Aug. 1, 2011) ...................................... 18

*Collins v. Pond Creek Mining Co.*,
   468 F.3d 213 (4th Cir. 2006) .............................................................. 14

*Contemporary Fin. Solutions, Inc. v. Miller*,
   07-cv-00793-M, 2007 WL 4197588 (D. Colo. Nov. 20, 2007)............................................ 18

*Dewhurst v. Century Aluminum Co.*,
   649 F.3d 287 (4th Cir. 2011) ............................................................ 8, 29

*Direx Israel, Ltd. v. Breakthrough Med. Corp.*,
   952 F.2d 802 (4th Cir. 1991) .............................................................. 8

*Fleet Boston Robertson Stephens, Inc. v. Innovex, Inc.*,
   264 F.3d 770 (8th Cir. 2001) ............................................................. 18

*Goldman Sachs & Co. v. Becker*,
   07cv-01599 WHA, 2007 WL 1982790 (N.D. Cal. July 2, 2007) ........................................ 18

*Graves v. Associated Transp., Inc.*,
   344 F.2d 894 (4th Cir. 1965) ............................................................. 14

*Herbert J. Sims & Co., Inc. v. Roven*,
   548 F. Supp. 2d 759, (N.D. Cal. 2008) ................................................... 18

*In re Merrill Lynch Auction Rate Sec. Litig.*,
   758 F. Supp. 2d 264 (S.D.N.Y. 2010)....................................................... 7

*In re Microsoft Corp. Antitrust Litig.*,
   355 F.3d 322 (4th Cir. 2004) .......................................................... 12, 14

*Interactive Brokers, LLC v. Duran*,
   08-cv-6813, 2009 WL 393827 (N.D. Ill. Feb. 17, 2009)....................................... 18

*J.P. Morgan Secs. Inc. v. La. Citizens Property Ins. Corp.*,
   712 F. Supp. 2d 70 (S.D.N.Y. 2010)..................................................... 15, 16, 20

*Kvaerner ASA v. Bank of Tokyo-Mitsubishi, Ltd.,*
   210 F.3d 262 (4th Cir. 2000) ................................................................... 25, 27

*Lummus Co. v. Commonwealth Oil Refining Co.,*
   297 F. 2d 80 (2d. Cir. 1961) ...................................................................... 12, 13

*Montana v. U. S.,*
   440 U.S. 147 (1979) ........................................................................................ 30

*Morgan Keegan & Co. v. Shadburn,*
   829 F. Supp. 2d 1141 (M.D. Ala. 2011) ........................................................ 18

*Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.,*
   460 U.S. 1 (1983) ............................................................................................ 30

*Patten Secs. Corp. v. Diamond Greyhound,*
   819 F.2d 400 (3d Cir. 1987) ...................................................................... 15, 16

*Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co.,*
   867 F.2d 809 (4th Cir. 1989) .......................................................................... 29

*Personal Sec. & Safety Systems Inc. v. Motorola Inc.,*
   297 F.3d 388 (5th Cir. 2002) ................................................................ 24, 25, 27

*Plant v. Merrifield Town Ctr. Ltd. P'ship,*
   711 F. Supp. 2d 576 (E.D. Va. 2010 ............................................................. 28

*Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co.,*
   324 U.S. 806 (1945) ........................................................................................ 28

*Smoothline Ltd. v. N. Am. Foreign Trading Corp.,*
   249 F.3d 147 (2d Cir. 2001) ........................................................................... 29

*Sverdrup Corp. v. WHC Constructors, Inc.,*
   989 F.2d 148 (4th Cir. 1993) .......................................................................... 29

*UBS Fin. Servs., Inc. v. W. Virginia Univ. Hosps., Inc.,*
   660 F.3d 643 (2d Cir. 2011)...................................................................... passim

*UBS Fin. Servs., Inc. v. W. Virginia Univ. Hosps., Inc.,*
   760 F. Supp. 2d 373 (S.D.N.Y. 2011)....................................................... passim

*Wash. Square Secs., Inc. v. Aune,* 385 F.3d 432 (4th Cir.2004) ................................... 26

*Waterford Inv. Services, Inc. v. Bosco,*
   11-cv-2103, 2012 WL 2354453 (4th Cir. June 21, 2012)............................ 14, 26

*Winter v. Natural Res. Def. Council, Inc.,*
   555 U.S. 7 (2008)............................................................................................... 8

iii

*WorldCrisa Corp. v. Armstrong*,
   129 F.3d 71 (2d Cir. 1997).................................................................................... 25

*WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*,
   533 F.3d 292 (4th Cir. 2009) .................................................................................. 8

**Other Authorities**

FINRA Notice 95-16......................................................................................................... 27

FINRA Rule 12100............................................................................................................ 20

FINRA Rule 12200.......................................................................................................passim

MSRB Rule D-9................................................................................................................. 21

MSRB Rule G-17............................................................................................................... 22

MSRB Rule G-35............................................................................................................... 20

S.E.C. Release No. 34-26805............................................................................................ 27

S.E.C. Release No. 39378 ................................................................................................ 20

Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d § 4445..................... 14

iv

## INTRODUCTION

Defendant Carilion Clinic ("Carilion") respectfully submits this Memorandum in opposition to the Motion for Preliminary Injunction filed by UBS Financial Services, Inc. ("UBS") and Citigroup Global Markets Inc. ("Citi") (collectively, "Arbitration Defendants").

Carilion engaged the Arbitration Defendants to recommend a financing structure for its debt.  The Arbitration Defendants have stipulated that they provided such advice and ultimately recommended that Carilion issue auction rate securities ("ARS").  Carilion paid the Arbitration Defendants both for their assistance in structuring Carilion's debt, and for ongoing broker-dealer services once the ARS were issued.  Under any plausible interpretation of the term "customer," Carilion is plainly a customer of the Arbitration Defendants and entitled to demand arbitration of its claims against the Arbitration Defendants under FINRA Rule 12200.

The Arbitration Defendants' motion for preliminary injunction should be denied.  Under the four-step test used by the Fourth Circuit for determining whether to grant motions for preliminary injunction, the Arbitration Defendants must first make a strong showing that they are likely to succeed on the merits.  They cannot meet this heavy burden.

The fact that the Arbitration Defendants filed this action in the Eastern District of Virginia – while at the same time invoking a forum selection clause that purportedly requires litigation of the underlying dispute in New York federal court – is telling.  The issue of whether an issuer of ARS is a customer of its underwriter and broker-dealer for the purposes of demanding arbitration under FINRA Rule 12200 has been litigated numerous times in the Second Circuit, *including by UBS*, who is collaterally estopped by prior decisions from disputing that Carilion is its customer.  All courts who have previously examined this issue have concluded that ARS issuers are customers of their underwriters and broker-dealers for the purposes of

1

FINRA Rule 12200. Furthermore, contrary to the Arbitration Defendants' argument that the Municipal Securities Rulemaking Board's ("MSRB") rules apply, the MSRB makes clear that arbitration is governed by FINRA's arbitration code, and therefore the FINRA's rules apply here.

Furthermore, Carilion did not waive its right to arbitrate in its broker-dealer agreement, which contains a forum selection clause. A forum selection clause in a single contract will not supplant an arbitration clause that covers a larger transaction. And waivers of arbitration must be explicit, but there is no such explicit waiver here. To the contrary, the forum selection clause may and, in view of the well-established federal policy in favor of arbitration, ought to be read in tandem with Rule 12200, which contemplates arbitration under these circumstances. Also, an injunction is an equitable remedy, yet the Arbitration Defendants have come to this court with unclean hands. By filing in this Court, they seek to avoid unfavorable precedent in the Second Circuit, and have filed suit in apparent violation of the very forum selection clause they seek to enforce. This is yet another reason why this court should deny the Arbitration Defendants' request for equitable relief to enforce that forum selection clause against Carilion.

Finally, the Arbitration Defendants also fail to establish the third and fourth elements required for a preliminary injunction – that the balance of equities tips in their favor, and that the injunction is in the public interest. Regarding the equities, the Arbitration Defendants' right to avoid arbitrating their claims with Carilion does not outweigh Carilion's right to a speedy and less expensive arbitration. And the public interests in favor of arbitration and in favor of the conclusive effect of prior judgments weigh against allowing the Arbitration Defendants to avoid arbitration here. For these reasons, the Arbitration Defendants' motion should be denied.

474576v.1

**OVERVIEW**

A.    **Carilion's 2005 issuance of auction rate securities.**

Defendant Carilion Clinic is a not-for-profit healthcare organization.  It operates eight hospitals, as well as outpatient specialty centers and advanced primary care practices, and serves approximately one million people in twenty-three counties and five cities in western Virginia. An important part of serving this community is providing top-quality infrastructure and facilities, which requires securing financing to build and maintain facilities.

In 2005, Carilion undertook to renovate and expand the Roanoke Memorial Hospital and to refinance existing debt.  Carilion decided to raise the money for these undertakings by issuing municipal bonds.  To determine the optimal financing structure for these bonds, Carilion engaged the Arbitration Defendants to recommend a financing structure.[1]

In 2005, while advising Carilion about its financing structure, the Arbitration Defendants prepared various presentations for Carilion, extolling the virtues of ARS and of a synthetic fixed-rate structure that combined ARS with an interest rate swap.  Citi, for instance, represented that "ARS represent one of the most efficient sources of tax exempt funding.  The market for these bonds is liquid, homogenous and competitive, resulting in low funding costs."[2]    UBS  likewise advised that Carilion should "[c]onsider more auction rate securities to reduce dependence on bank enhancement as bond insurance for Aa3/AA- credits is currently below 90 basis points."[3]

---

[1]  *See* Declaration of G. Robert Vaughan, ("Vaughan Decl."), Exhibits A & B, at 3 ("Provide a recommended financing structure for the upcoming bond issue….").

[2]  Vaughan Decl., Exhibit C, at 3-5, 15 ("Step 1: Issue Auction Rate Securities (ARS) … Step 2: A Swap is a Contract to Exchange Floating for Fixed Rates … Step 3: The % of LIBOR Swap Creates a 'Synthetic' Fixed Rate … ***The result: a fixed funding cost.*** … Benefits: Lower, long term fixed rate than 'natural' fixed rate bonds resulting in greater savings.").

[3]  Vaughan Decl., Exhibit D, at 9, 15 ("Financing considerations for Carilion:  Consider fixed rate swaps against variable rate debt. … Consider more auction rate securities to reduce dependence on bank enhancement as bond insurance for Aa3/AA- credits is currently below 90 basis points. … A

3

Ultimately, the Arbitration Defendants jointly suggested that Carilion "should utilize this proven financing vehicle [ARS] for a significant portion of the Series 2005 financing with cost-effective bond insurance."[4]  The Arbitration Defendants also recommended that Carilion use a floating-to-fixed rate swap to create what is referred to as a synthetic fixed interest rate.[5] Carilion acted in reliance on the Arbitration Defendants' recommendations.

As alleged in its Statement of Claim, the facts of which the Arbitration Defendants have stipulated to for purposes of this motion,[6] the Arbitration Defendants were not merely underwriters, but also provided advice:

> 20.     Carilion engaged UBS and Citi to assist with structuring and to underwrite the financings.  The parties agreed that the transaction would be 'negotiated,' meaning that UBS and Citi worked closely with Carilion to structure the bond issuance.
>
> 21.     UBS and Citi and their representatives actively participated in structuring and implementing Carilion's 2005 financing.  UBS and Citi ultimately advised Carilion on what they regarded as the appropriate capital-generation structure for Carilion's bonds…[7]

These facts belie the Arbitration Defendants' current assertion that they acted as an arms-length underwriter and nothing more.  Memo. in Support at 5-7.  The Arbitration Defendants ultimately advised Carilion on the appropriate bond-issuance structure; acted as Carilion's agent in dealing with bond insurers and the rating agencies; bought the bonds from Carilion and resold

---

'BMA/LIBOR basis swap' offers Carilion an opportunity to save up to 36 basis points annually, if it is willing to accept the 'tax risk.'").

[4] Vaughan Decl., Exhibit E ("Utilize insured auction rate securities – Carilion should utilize this proven financing vehicle for a significant portion of the Series 2005 financing with cost-effective bond insurance.").

[5] Vaughan Decl., at ¶ 11.

[6] *See* Arbitration Defendants' Memo. in Support, at 4 ("For the purposes of this motion, allegations set forth in Carilion's Statement of Claim filed in the FINRA Arbitration are assumed to be true."). Carilion's Statement of Claim ("Stmt. Of Claim") is attached as Exhibit 1 to Arbitration Defendants' Memo in Support.

[7] Stmt. of Claim at ¶¶ 20-21.

them; sold interest rate swaps incident to these bond issuances that supposedly supported the structure they recommended; provided continuing advice related to these swaps, including how the swaps should be booked; provided monitoring and advisory services regarding the bonds and the swaps after the issuance; functioned as the main broker-dealers for the auctions; and performed various other tasks as Carilion's advisors, partners, agents, and fiduciaries.[8]  In doing so, the Arbitration Defendants didn't merely underwrite a bond issuance; they closely advised Carilion on a whole host of financial issues.

Perhaps most importantly, Carilion <u>paid</u> the Arbitration Defendants for their structuring advice (as well as for their broker-dealer services).  The Arbitration Defendants earned an underwriter's discount, part of which constituted a management fee that represents a payment to the Arbitration Defendants for, among other things, their assistance in structuring the transaction.[9]  Following the issuance of the ARS, Carilion also paid a broker-dealer fee of 25 basis points to the Arbitration Defendants annually in exchange for services managing the auctions for the bonds.[10]  This broker-dealer fee resulted in annual payments to the Arbitration Defendants of broker-dealer fees in excess of $500,000.

## B.     The Arbitration Defendants withheld material information and engaged in other misconduct.

In recommending that Carilion issue ARS, the Arbitration Defendants withheld material facts about the ARS market and the Arbitration Defendants' role in it.  The Arbitration Defendants described the ARS market as "liquid, homogenous, and competitive," but omitted that for many years they had placed support bids at virtually all the auctions for ARS they had

---

[8] *See* Stmt. of Claim, at ¶ 21.

[9] Vaughan Decl. at ¶ 12.  *See also* Vaughan Decl., Exhibit A & B at 3 ("Provide your proposed management fee, takedown, and/or other expenses for your recommended financing structure.").

[10] *See* Exhibit 5 to Memo in Support, at 5 ("Broker-Dealer Fee to be Paid to UBS."); Exhibit 7 to Memo in Support, at 5 ("Broker-Dealer Fee to be Paid to Citi.").

underwritten in order to prevent these auctions from failing.   (Stmt. of Claim at ¶ 25).   The Arbitration Defendants also failed to disclose that, without their support bids, the auctions would fail and the interest-rate swaps would not function as designed.   (*Id. at ¶¶* 30-31).   At all relevant times, the Arbitration Defendants were fully aware that their participation as bidders at ARS auctions was vitally necessary to prevent auction failures.   (*Id.* at ¶ 25).   Consequently, they knew (but Carilion did not) that if they did not continue to support the ARS bond market, the market would collapse and issuers would be stuck paying the failed-auction rate, as high as 15%, several times the prevailing rate for a more conservative fixed-rate issuance.

The Arbitration Defendants' recommendation that Carilion issue ARS was not surprising, in hindsight, because ARS were more lucrative for the Arbitration Defendants than alternative debt structures.   As lead broker-dealers for ARS, the Arbitration Defendants stood to earn 25 basis points a year in remarketing fees (compared to 7 basis points or less for standard variable-rate bonds) and their affiliates earned a spread on the interest-rate swaps.   (*Id.* ¶ 32).

Initially, Carilion's auctions succeeded in creating a synthetic fixed interest rate because the Arbitration Defendants' support bids resulted in an interest rate that was in line with their projections.   (*Id.* at ¶ 34).   Beginning in early 2008, however, the Arbitration Defendants stopped submitting support bids at these rates and an auction for Carilion's bonds promptly failed.   (*Id.* at ¶ 35).   When the auction failed, the recommended swaps provided no protection to Carilion, who was forced to pay both high auction rates and the fixed payments under the swaps.   (*Id.*). Carilion's total interest expense rapidly increased, and Carilion was forced to refinance its bonds at considerable expense.   (*Id.* at ¶ 36).

In sum, the Arbitration Defendants recommended to Carilion a debt structure that was wholly dependent on the viability of the ARS market, even though they knew the ARS market

would fail without their active support.  They never disclosed this very important fact and, when they withdrew their support, Carilion was left to pay auction rates of up to 15%, with no protection from its interest rate swap.  The damages Carilion sustained – including increased interest payments, swap termination payments, and costs of refinancing – have directly reduced Carilion's ability to serve the health care needs of Virginia residents.

## C.   Procedural history of Carilion's claims

Pursuant to FINRA rules, customers of FINRA members may arbitrate claims arising out of the business activities of those members.[11]  The Arbitration Defendants are FINRA members and Carilion is their customer because the Arbitration Defendants here acted at all material times as underwriters of, and broker-dealers for, Carilion's 2005 bonds.

On February 11, 2012, Carilion filed a Statement of Claim initiating FINRA arbitration.[12] Carilion alleged that, as outlined above, the Arbitration Defendants breached their fiduciary duties to Carilion. (*Id.* at ¶¶ 37-39).  Carilion also stated claims for negligent misrepresentation, fraud, violations of the federal and state securities laws, and breaches of NASD and MSRB rules. (*Id.* at ¶¶ 40-56).   Similar claims by an ARS issuer survived a motion to dismiss in *In re Merrill Lynch Auction Rate Sec. Litig.*, 758 F. Supp. 2d 264, 270 (S.D.N.Y. 2010).

The Arbitration Defendants' Answer to the Statement of Claim was initially due on April 9, 2012.[13]  At the Arbitration Defendants' request, Carilion consented to a 60-day extension of the time for the Arbitration Defendants to file their answers, until June 11, 2012.[14]  Carilion's agreement to that extension was contingent on the parties selecting arbitrators in this matter, and

---

[11] *See* FINRA Rule 12200, attached as exhibit H to the Declaration of Jason Burge ("Burge Decl.").

[12] *See* Stmt. of Claim.

[13] *See* Burge Decl. at ¶ 2.

[14] *Id.* at ¶ 3, Exhibits A & B.

7

arbitrator rankings have been submitted by both sides in the FINRA proceeding.[15]   On June 8, 2012, three days before their Answer was due, the Arbitration Defendants filed a Complaint and a Motion for Preliminary Injunction in this Court, seeking to enjoin the pending arbitration.

## ARGUMENT

A preliminary injunction is an "extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir. 1991) (internal quotations omitted).   It may only be awarded upon "a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

This Circuit has established a four-factor test governing the issuance of a preliminary injunction.  In order to receive a preliminary injunction, a plaintiff must establish: (1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest.[16]   In particular, the Fourth Circuit has noted that any party seeking a preliminary injunction must "clearly show that it is likely to succeed on the merits."[17]

The Arbitration Defendants cannot make this showing.   Under FINRA Rule 12200, arbitration is required if Carilion's claims constitute "a dispute between a FINRA member and its 'customer,' and the dispute relates to the business activities of the FINRA member."   Based on prior decisions, UBS is precluded from challenging whether Carilion is a customer.   And as to Citi, Carilion's claims squarely meet this definition, and therefore the Arbitration Defendants cannot clearly show that they are likely to succeed on their argument that Carilion's claims are

---

[15] *Id.*

[16] *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011) (citing *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 533 F.3d 292, 298 (4th Cir. 2009)).

[17] *Dewhurst*, 649 F.3d at 290 (citing *Winter*, 555 U.S. at 20).

not arbitrable.  The Arbitration Defendants' MSRB arguments fail because FINRA rules govern

arbitration even for MSRB members.  The Arbitration Defendants' waiver argument fails

because a forum selection clause in a single contract does not supersede an arbitration agreement

applicable to a broader transaction, and the two clauses can be easily harmonized.

In addition, the balance of equities does favor Arbitration Defendants, and the public

interest does not favor parties repeatedly litigating the same issue thereby delaying arbitrations.

**A.     UBS is collaterally estopped from claiming that Carilion is not its customer based on
prior decisions of the SDNY and Second Circuit in *UBS v. WVUH*.[18]**

**1.      The *UBS v. WVUH* decision**

In *UBS Fin. Servs., Inc. v. W. Virginia Univ. Hosps., Inc.*, 660 F.3d 643, 650 (2d Cir.

2011) (hereafter, "*WVUH*"), UBS was one of two plaintiffs[19] who sought to enjoin five issuers of

ARS from arbitrating their claims that UBS defrauded them by misrepresenting the facts of

UBS' bidding policies during the process of structuring their ARS.  The facts and legal claims of

*WVUH* are very similar to the present case, as is apparent from the courts' description:

> On February 12, 2010, WVUH initiated the FINRA arbitration that is the subject
> of this appeal by filing an arbitration Statement of Claim against UBS under Rule
> 12200 of the FINRA Code. Among other claims, WVUH alleged that UBS
> violated the Securities Exchange Act of 1934 and the Uniform Securities Act by
> advising WVUH to issue ARS while withholding critical information about the
> ARS market and UBS's role in it. The Statement of Claim also alleged that UBS
> fraudulently induced WVUH to purchase auction services, again by withholding
> critical information about the ARS market and UBS's role. For example, WVUH
> claimed that UBS failed to disclose its practice of placing support bids in the
> Dutch auctions for ARS it underwrote (including WVUH's ARS), the
> significance of that support to the success of the auctions, and that the auctions for
> WVUH's bonds would fail as soon as UBS stopped submitting support bids. In
> addition to the substantive claims, WVUH alleged that FINRA had jurisdiction
> over the claims because WVUH was a "customer[ ] of [UBS] and this dispute

---

[18] Carilion acknowledges that the issue of waiver of arbitration was not specifically addressed in the
*WVUH* proceeding, and thus Carilion does not contend that UBS is precluded from litigating that issue
here.

[19] The other plaintiff in that case was UBS Securities, LLC, an affiliate of UBS.

[arose] from the business activities of [UBS], including but not limited to underwriting and broker-dealing."[20]

The primary issue in *WVUH* was whether WVUH, as an issuer of ARS, was a customer of UBS, its underwriter and broker-dealer.[21]  UBS's preliminary injunction was denied because while UBS established irreparable harm (it was not contested), it failed to demonstrate a likelihood of success on the merits of the "customer" issue and the balance of the hardships favored the party seeking arbitration, who had a "right to a speedy arbitration of their claims."[22]

Following the denial of UBS' motion for preliminary injunction, the district court asked UBS whether it intended to pursue further proceedings.[23]  Rather than seek discovery or a permanent injunction, UBS requested the entry of a final order of dismissal, because it sought to "seek review by the Second Circuit on an expedited basis" and believed that "it would be sensible and efficient for that appeal to go forward on the basis of the present record and the [Court's decision]."[24]  UBS represented, "[g]iven the nature of the case, *it seems unlikely that discovery and full development of the case at the district court level would lead to a different outcome than is stated in the [Court's decision]*."[25]

On appeal, the Second Circuit affirmed on the alternative ground that WVUH was UBS's customer because of the services UBS rendered in its capacity as a broker-dealer charged with

---

[20] *UBS Fin. Services, Inc. v. W. Virginia Univ. Hospitals, Inc.*, 660 F.3d 643, 646-47 (2d Cir. 2011).

[21] *See UBS Fin. Services, Inc. v. W. Virginia Univ. Hospitals, Inc.*, 760 F. Supp. 2d 373, 379 (S.D.N.Y. 2011) ("Thus, the only remaining question is whether Defendants qualify as 'customers' of UBS under the FINRA code."); *WVUH*, 660 F.3d at 645 ("With respect to both the bond issuance it underwrote and the auctions it agreed to facilitate, UBS asserted that WVUH was not its 'customer' entitled to arbitration under FINRA Rule 12200.").

[22] *UBS Fin. Services, Inc. v. W. Virginia Univ. Hospitals, Inc.*, 760 F. Supp. 2d 373, 379 (S.D.N.Y. 2011) *aff'd in part, vacated in part,* 660 F.3d 643 (2d Cir. 2011).

[23] *Id.* at 380. ("ORDERED that UBS is directed to inform the Court by January 11, 2011 whether, in light of the instant ruling, it contemplates any further proceedings in this Court.")

[24] *See* Burge Decl., Exhibit C.

[25] *Id.* (emphasis added).

facilitating the ARS auctions.  In response to UBS's argument that the term "customer" should be limited to investors or unsophisticated parties, the court found that FINRA's rules contemplate "large or complex cases" including "customers who are well-capitalized or sophisticated institutions and individuals," and that FINRA's stated purposes are much broader than a mere investor-protection mandate.[26]   In response to UBS's argument that WVUH's lawsuit did not arise from its broker-dealing services, the Second Circuit noted that each transaction clearly contemplated the issuance of ARS to be serviced by UBS, and because the Statement of Claim referred to UBS's policies as a broker-dealer in describing UBS's misconduct, the "auction services transactions … are integrally related to and of a piece with the underwriting services UBS provided."[27]  The court continued:

> Our holding is that, in this case, UBS cannot avoid arbitration by arguing that WVUH was a customer only in a limited respect when the customer relationship is part of a series of interrelated transactions serving a common purpose and when there is a "contractual basis for concluding that the party agreed to" arbitration with a party that was its customer under the FINRA Rules.[28]

Following the appeal, UBS sought no further judicial relief, and arbitration proceeded.

The Arbitration Defendants claim that the *WVUH* decision has no application here, because the Second Circuit "explicitly declined to reach the issue of whether an issuer was a 'customer' of an underwriter, affirming on alternate grounds."[29]  This is wrong.  The Second Circuit concluded that it did not need to address whether *every issuer* is a customer of its underwriter, because the Second Circuit was quite clear that *an issuer of ARS* is a customer of its underwriter and broker-dealer, because ARS issuers pay considerable fees for broker-dealer

---

[26] *UBS Fin. Servs., Inc.* 760 F. Supp. 2d at 651-52.

[27] *Id.* at 652-53.

[28] *UBS Fin. Services, Inc. v. W. Virginia Univ. Hospitals, Inc.*, 660 F.3d 643, 653 n. 6 (2d Cir. 2011).

[29] Memo in Support at 16.

services from their underwriters and broker-dealers.[30]   Here, UBS was an underwriter and broker-dealer of Carilion's ARS.  The Second Circuit decision is precisely on point.

### 2.   Collateral estoppel bars UBS from relitigating the "customer" issue.

"The doctrine of 'collateral estoppel' or 'issue preclusion' … forecloses the relitigation of issues of fact or law that are identical to issues which have been actually determined and necessarily decided in prior litigation in which the party against whom [collateral estoppel] is asserted had a full and fair opportunity to litigate."[31]   In order to apply issue preclusion, the proponent must demonstrate five elements:

(1) the issue is identical to the one previously litigated;
(2) the issue was actually resolved in the prior proceeding;
(3) the issue was critical and necessary to the judgment in the prior proceeding;
(4) the judgment in the prior proceeding is final and valid; and
(5) the party to be foreclosed by the prior resolution of the issue or fact had a full and fair opportunity to litigate the issue or fact in the prior proceeding.  *Id.*

Here, there can be little dispute that the issue here – whether an ARS issuer is a customer entitled to arbitrate claims of misrepresentation and fraud against its underwriter and broker-dealer – (1) is identical to that in *WVUH*, (2) was actually resolved in *WVUH*, and (3) was critical and necessary to the judgment in *WVUH*, given that it was the principal issue presented.

Regarding finality and validity, ordinarily a judgment on a preliminary injunction is not a final judgment.  However, as the Court noted in *Lummus Co. v. Commonwealth Oil Refining Co.*:

Whether a judgment, not "final" in the sense of 28 U.S.C. § 1291, ought nevertheless be considered "final" in the sense of precluding further litigation of the same issue, turns upon such factors as the nature of the decision (i.e., that it was not avowedly tentative), the adequacy of the hearing, and the opportunity for review.  "Finality" in the context here relevant may mean little more than that the

---

[30] *WVUH*, 660 F.3d at 650 ("We need not resolve whether its ruling on this ground was correct, since we affirm on the different ground that WVUH was UBS's customer because WVUH purchased a service, specifically auction services, from UBS.").

[31] *In re Microsoft Corp. Antitrust Litig.*, 355 F.3d 322, 326 (4th Cir. 2004).

litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again.[32]

In *Lummus*, Commonwealth obtained a district court order preliminarily enjoining an arbitration initiated by Lummus on the basis that the agreement had been fraudulently induced.[33]   On appeal, the First Circuit held that Commonwealth had not established a substantial issue relating to fraud in the inducement, reversed the lower court, and ordered arbitration.  Lummus moved to compel arbitration in New York, and Commonwealth again sought a stay of the arbitration for a trial on arbitrability.  The Second Circuit concluded that the First Circuit's decision was not meant to be tentative, and that due to the appeal, the parties and the court obviously had adequate opportunity for briefing and review.[34]   The Second Circuit noted that "the general policy of preventing relitigation applies with peculiar force to issues preliminary to arbitration," and held that issue preclusion prevented Commonwealth from relitigating fraud in the inducement.[35]

Similarly, here, UBS twice had the opportunity to fully brief whether an ARS issuer is a customer of its underwriter and broker-dealer, and UBS announced that further factual proceedings would not affect the outcome.  UBS cannot decry the inadequacy of prior procedures when it specifically chose those procedures.  The prior judgments are surely sufficiently final to justify preclusion of the issue raised here, at least for the purposes of a

---

[32] *Lummus Co. v. Commonwealth Oil Refining Co.,* 297 F. 2d 80, 89 (2d. Cir. 1961) (Friendly, J.).

[33] *Id.*

[34] *Id.* at 89-90.

[35] *Id.*

preliminary injunction.[36]   UBS's claim that Carilion is not its customer for the purposes of

FINRA Rule 12200 is barred by collateral estoppel.[37]

**B.     Carilion's claims constitute a dispute between FINRA members and their customer and the dispute relates to the business activities of the FINRA members.**

> **1.     Judicial precedent, administrative precedent, and the Arbitration Defendants' past conduct all support the conclusion that Carilion is a customer.**

FINRA Rule 12200 requires that FINRA members arbitrate disputes arising in

connection with their business activities if "requested by a customer."  This Rule creates an

arbitration agreement between FINRA members and their customers.[38]   The Arbitration

---

[36]  *See also* Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d § 4445 at 305, ("Preclusion may be properly applied [based on a ruling on a preliminary injunction], however, if the same showing are made and it appears that nothing more is involved than an effort to invoke a second discretionary balancing of the same interests.").

[37]      Two additional issues relating to preclusion that UBS may raise – (1) whether Carilion, who was not a party to *WVUH*, may benefit from issue preclusion, and (2) whether the doctrine of issue preclusion requires a court in the Fourth Circuit to recognize the preclusive effect of a ruling of the Second Circuit – need not detain us long.

The rule of mutuality in issue preclusion has been abandoned by the federal courts, and courts in this circuit routinely recognize issue preclusion by third parties (so called non-mutual issue preclusion) provided that such preclusion is fair. *See, e.g., Collins v. Pond Creek Mining Co.*, 468 F.3d 213, 221 (4th Cir. 2006).  The principal concern of courts considering the fairness of non-mutual issue preclusion is whether the first case offered the party resisting preclusion "a full and fair opportunity to present [its] case." *Graves v. Associated Transp., Inc.*, 344 F.2d 894, 900 (4th Cir. 1965).  Courts "have willingly inquired into the circumstances of the actual case, and time and again they have allowed the plea against a party not having the initiative in the former action whenever they have been satisfied that the party against whom the former judgment was invoked in fact had a realistically full and fair opportunity to litigate the issues in the former action." *Id.*  There can be no dispute that UBS had an incentive to pursue its claims in the *WVUH* case fully and vigorously, and in fact did so, so there is no unfairness in applying issue preclusion here.

The fact that *WVUH* was decided in the Second Circuit should not defeat preclusion.  Courts in the Fourth Circuit routinely recognize the preclusive effect of decisions from other Circuits. *See, e.g., In re Microsoft Corp. Antitrust Litig.*, 355 F.3d 322, 326 (4th Cir. 2004) (applying issue preclusion based on ruling of D.C. Circuit).  UBS has not identified any law specific to the Fourth Circuit that would compel a different result in this case.

[38]  *Waterford Inv. Services, Inc. v. Bosco*, 11-2103, 2012 WL 2354453 (4th Cir. June 21, 2012) ("This provision constitutes an 'agreement in writing' under the Federal Arbitration Act, 9 U.S.C. § 2, which binds ... [a FINRA] member, to submit an eligible dispute to arbitration upon a customer's demand.") (internal citations omitted).

14

Defendants argue that Carilion has no right to request arbitration under FINRA Rule 12200 because, according to the Arbitration Defendants, Carilion is not a "customer" within the meaning of that rule. This argument fails.

### i.    Judicial Precedent

FINRA defines "customer" broadly, as "A customer shall not include a broker dealer."[39] Every court that has addressed the issue has held that an issuer of securities, no less than an investor in securities, is a "customer" within the meaning of FINRA Rule 12200.[40] Two of these courts specifically held that ARS issuers are "customers" of their underwriters and broker-dealers pursuant to FINRA Rule 12200.[41] The rationale of these ARS issuer cases is very straight-forward and plainly applies here. To reiterate, the Second Circuit explained that the issuer in *WVUH* was a customer because:

- FINRA defines a "customer" as "not a broker or a dealer." This is a very broad definition. *WVUH*, 660 F.3d at 649-50.[42]

- The dictionary defines customer as "someone who buys goods or services." *Id.* at 650. Thus, the "term 'customer' includes at least a non-broker or non-dealer who purchases, or undertakes to purchase, a good or service from a FINRA member." *Id.*

- WVUH, as an ARS issuer, "became UBS's customer under Rule 12200 by contracting with UBS to obtain auction services for a fee."

---

[39] FINRA Rule 12100, attached as Exhibit G to Burge Decl.

[40] *See, e.g., UBS Fin. Services, Inc. v. W. Virginia Univ. Hospitals, Inc.*, 760 F. Supp. 2d 373, 378 (S.D.N.Y. 2011) *aff'd in part, vacated in part on other grounds,* 660 F.3d 643 (2d Cir. 2011) ("FINRA intended for an issuer to be a customer of an underwriter"); *Patten Secs. Corp. v. Diamond Greyhound*, 819 F.2d 400, 406 (3d Cir. 1987) (stating that an issuer "is a public customer entitled to demand NASD arbitration") (abrogated on other grounds); *J.P. Morgan Secs. Inc. v. La. Citizens Property Ins. Corp.*, 712 F. Supp. 2d 70, 80 (S.D.N.Y. 2010) ("This dispute arises directly from the parties' issuer/underwriter relationship—which, as discussed, did create a customer relationship between the parties.").

[41] *UBS*, 660 F.3d 643 (ARS issuer was "customer" of UBS and was entitled to demand FINRA arbitration); *J.P. Morgan*, 712 F. Supp. 2d 70 (ARS issuer was "customer" of J.P. Morgan and was entitled to demand FINRA arbitration).

[42] In an online glossary, FINRA again broadly defines customer as "a person or entity (not acting in the capacity of an associated person of member) that transactions business with any member firm and/or associated person." *Id.*

15

Here, Carilion not only obtained auction services for a fee but also paid a management fee for the Arbitration Defendants' efforts in structuring the transaction. The Arbitration Defendants' withholding of information and related conduct in these two roles – namely, as underwriter in structuring the transaction at issue for Carilion and as broker-dealer in submitting undisclosed bids to prop up the ARS market – forms the basis for Carilion's claims. Because Carilion, as an ARS issuer, purchased services from the Arbitration Defendants in the form of assistance in structuring a transaction and ongoing broker-dealer fees, Carilion was a customer.

### ii.   *Administrative Precedent*

The NASD's National Arbitration Committee[43] specifically determined that "an issuer of securities should be considered a public customer of a member firm." *Patten*, 819 F. 2d at 406. And FINRA has specifically determined that issuers like Carilion should be entitled to demand arbitration. After J.P. Morgan lost its motion for preliminary injunction in the *La. Citizens* matter, it moved for the FINRA director to decline to exercise his jurisdiction to arbitrate the dispute, arguing that it was not properly arbitrable under FINRA's rules.[44] The FINRA director refused, and ordered J.P. Morgan to arbitrate its claims with its ARS issuer customer.[45]

### iii.   *The Arbitration Defendants' past conduct*

Finally, the Arbitration Defendants have previously arbitrated, and are continuing to arbitrate, multiple disputes brought by ARS issuers who claim they are customers of the Arbitraiton Defendants. Citi has submitted to arbitration in disputes filed by Cabell-Huntington

---

[43] The NASD was the predecessor of FINRA.

[44] Burge Decl., Exhibit D.

[45] *See* Burge Decl., Exhibit E. *See also WVUH*, 660 F.3d at 652 ("FINRA appears to have rejected the interpretation of FINRA's rules advanced by UBS and the dissent. While this appeal was pending, UBS raised the very argument it raises here in seeking a stay of arbitration from the Director of FINRA Dispute Resolution, who 'perform[s] all the administrative duties relating to arbitrations submitted under the Code.' FINRA Rule 12103. That motion was summarily denied. Though we need not rely on FINRA's decisions to conclude that WVUH was UBS's customer, we note that FINRA's practical application of its own rules in this case does not support UBS's position.").

Hospital, Inc. and Baylor Medical Center.[46]   In the submission agreements signed by Citi, it acknowledged that it submits "the present matter in controversy … to arbitration in accordance with the FINRA By-Laws, Rules, and Code of Arbitration Procedure."[47]   This statement confirms that Citi recognized that those ARS issuers were entitled as customers to arbitrate their claims, because no other basis for arbitration was asserted by the parties to those disputes.

Similarly, UBS arbitrated the WVUH claim, and has presently filed answers and is proceeding in arbitration with claims filed by another five ARS issuers without any effort to prevent arbitration.[48]   UBS's present arguments are inconsistent with the fact that UBS is proceeding to arbitrate claims filed by five other ARS issuers.

**2.     The cases cited by the Arbitration Defendants are plainly distinguishable.**

Despite the overwhelming judicial and administrative precedent establishing that Carilion is a customer, Citi and UBS argue that "customer," as that term is used in Rule 12200, should be limited to customers who "receive investment or brokerage services."   The cases on which Arbitration Defendants rely for this argument, however, are plainly distinguishable.

In *Fleet Boston*, a FINRA member sued to recover fees that it earned advising a company in connection with a merger.[49]   The company countered by demanding arbitration.   The court examined Rule 12200 and held that a customer is "one who receives investment and brokerage services or otherwise deals more directly with securities than what occurred here."   *Fleet Boston*, 264 F.3d at 772.   The court went on to note that an issuer should be able to arbitrate a claim arising from an underwriting, because "[a]lthough the relationship between [the issuer and

---

[46] Burge Decl., at ¶¶ 6-7.

[47] *Id.*, Exhibit F.

[48] *See* Burge Decl., at ¶ 8.   UBS is challenging the arbitrability of an arbitration brought by Pasadena, in the case captioned *UBS Financial Services, Inc. and UBS Securities LLC  v. City of Pasadena, California*, United States District Court for the Central District of California, No. CV-12-5019.

[49] *Fleet Boston Robertson Stephens, Inc. v. Innovex, Inc.*, 264 F.3d 770, 772 (8th Cir. 2001).

underwriter] was not a broker/investor relationship, it still related directly to the issuance of securities, rather than banking advice." *Id.* at 773 n.3.  In short, *Fleet Boston* does not stand for the proposition that only investors can compel FINRA arbitration, but rather that arbitration under the organization that oversees the securities industry is reserved for customers who receive goods or services related to securities.  That definition of customer includes Carilion.

The other cases cited by the Arbitration Defendants in favor of an "investor or brokerage" limitation on the term "customer" all concern privity.  In each case, the issue before the court was whether an investor who invested with a third party nonetheless has a sufficiently close relationship with the member firm to qualify as a customer.[50]  Privity is not an issue here.  And since each cases cited by the Arbitration Defendants involved investors, the issue of whether "customer" should be limited to investors was obviously not an issue in any of those cases.[51]

## C.     The MSRB Rules do not compel a different result.

In an attempt to avoid the FINRA Rules and courts' common-sense interpretation of them, the Arbitration Defendants here contend that (1) the MSRB Rules — not the FINRA Rules

---

[50] *Morgan Keegan & Co. v. Shadburn*, 829 F. Supp. 2d 1141, 1147 (M.D. Ala. 2011) (finding defendant investor was not a customer where "Keegan's position is that there never was any sort of relationship between it and [plaintiff]."); *Berthel Fisher & Co. Fin. Services, Inc. v. Larmon*, CIV. 11-889 ADM/JSM, 2011 WL 3294682 (D. Minn. Aug. 1, 2011) (defendant-investor was not a customer of plaintiff-firm where defendants invested with a customer of the firm); *Interactive Brokers, LLC v. Duran*, 08-CV-6813, 2009 WL 393827 (N.D. Ill. Feb. 17, 2009) (defendant-investors were not customers of plaintiff-firm where defendants invested with a third-party); *Herbert J. Sims & Co., Inc. v. Roven*, 548 F. Supp. 2d 759, 761 (N.D. Cal. 2008) (same); *Goldman Sachs & Co. v. Becker*, C 07 01599 WHA, 2007 WL 1982790 (N.D. Cal. July 2, 2007) (same); *Contemporary Fin. Solutions, Inc. v. Miller*, CIV.A. 07-CV-00793-M, 2007 WL 4197588 (D. Colo. Nov. 20, 2007) (defendant-investors were not customers where they "never had a direct business relationship with either Defendant").

[51] Arbitration Defendants also suggest that the use of "customer" in the Broker-Dealer Agreements when referring to investors precludes Carilion from being a customer.  Memo in Support at 17.  Certainly, investors who purchase ARS through Arbitration Defendants are customers, but that does not preclude Carilion from also being Arbitration Defendants' customer, given that Carilion is paying the Arbitration Defendants to perform the services described in the Broker-Dealer Agreement.  And these sections of the Broker-Dealer Agreement, which address how Arbitration Defendants should handle investor bids during auctions, do not even purport to define customer for the purposes relevant here.

— define who is a "customer" in the *municipal* securities context, and (2) under the MSRB Rules, Carilion is not a "customer."

The Arbitration Defendants are wrong on both counts.   First, in the municipal context, the Arbitration Defendants are subject to the rules of *both* organizations, and the rules of FINRA are the applicable rules relating to arbitration.   Second, even if the MSRB Rules alone governed the underlying dispute, Carilion would be a "customer" under the MSRB Rules.

### 1.    FINRA Rules apply in the municipal context.

FINRA is a self-regulatory organization that oversees the securities industry.     The MSRB is a self-regulatory organization that oversees the municipal securities industry specifically.   The Arbitration Defendants are members of both organizations.

As part of its regulatory program, FINRA operates the largest dispute resolution forum in the securities industry.   The MSRB, until 1998, also operated a dispute resolution forum, for disputes involving municipal securities specifically.   Since 1998, however, disputes involving municipal securities have been arbitrated or mediated by FINRA, and MSRB members have been subject to FINRA Rules.   This transition was approved and announced by the S.E.C. in a notice that expressly stated that henceforth MSRB members shall be deemed members of, and subject to the rules of, FINRA (then, the NASD):

> Those MSRB members who are not also members of another SRO (the bank dealers) will now be deemed "members" of the NASD for purposes of arbitrating claims involving the municipal securities activities of bank dealers.  The proposed rule change accomplishes this by subjecting every bank dealer, as of January 1, 1998, to the NASD's Code of Arbitration Procedure for every claim, dispute or controversy arising out of or in connection with the municipal securities activities of the bank dealer acting in its capacity as such.  *In addition, the proposed rule change requires that bank dealers abide by the NASD's Code just as if they were members of the NASD for purposes of arbitration.*[52]

---

[52] S.E.C. Release No. 39378 (December 1, 1997) (emphasis added), attached as Exhibit I to Burge Decl.

Accordingly, MSRB Rule G-35 instructs that the Arbitration Defendants are "subject to, and shall abide by, [FINRA's] Code of Arbitration Procedure, including any amendments thereto, as if the bank dealer were a 'member' of [FINRA]." Tellingly, the Arbitration Defendants omit this portion of MSRB Rule G-35 from their own analysis.

The Arbitration Defendants contention that the MSRB's definition of 'customer' supplants FINRA Rule 12200 for the purposes of arbitration is simply incorrect. Memo in Support at 12-13. The MSRB has directed that MSRB members are subject to the FINRA Code of Arbitration for purposes of arbitration, and FINRA Rules 12200 (a member of FINRA must arbitrate a dispute if "requested by a customer") and 12100 ("A customer shall not include a broker-dealer.") are part of that Code.[53] Accordingly, FINRA Rules 12200 and 12100 are the applicable provisions on the issue of arbitrability and whether Carilion is a customer.[54]

## 2. Carilion is a "customer" of UBS and Citi under the MSRB Rules.

In any event, contrary to the Arbitration Defendants' representation, Carilion is a "customer" under the MSRB Rules. The Arbitration Defendants point to MSRB Rule D-9, which defines "customer" as "any person other than a broker, dealer, or municipal securities dealer acting in its capacity as such or *an issuer in transactions involving the sale by any issuer of a new issue of its securities.*" (Emphasis added.) Relying on the emphasized portion of the rule, they argue that Carilion, as an issuer of securities, is expressly excluded from the definition. The Arbitration Defendants, however, neglect to mention that the rule has been interpreted, *since*

---

[53] Sections 12100 through 12905 of the FINRA Rules constitute the Code of Arbitration Procedure for Customer Disputes.

[54] *See also Louisiana Citizens*, 712 F. Supp. 2d at 78 (S.D.N.Y. 2010) ("Because MSRB is a distinct entity from FINRA, there is little reason its rules should influence the definition of customer for purposes of FINRA's compulsory arbitration agreement.").

20

*1978*, to exclude an issuer such as Carilion from the definition of "customer" *only* "in the case of a sale by it of a new issue of its securities." The MSRB, interpreting Rule D-9, advised:

> An issuer would be a 'customer' within the meaning of the rule except in the case of a sale by it of a new issue of its securities.[55]

In other words, an issuer such as Carilion would remain a customer for all other purposes, including much of the Arbitration Defendants' conduct here: "participating in structuring and implementing Carilion's 2005 financing … advis[ing] Carilion on what they regarded as the appropriate capital-generation structure for Carilion's bonds; act[ing] as Carilion's agents in dealing with the rating agencies; assist[ing] with ARS-related discussions with bond insurers on Carilion's behalf; … provid[ing] monitoring and advisory services regarding the bonds and the swap after the issuance; function[ing] as the main broker-dealers for Carilion's ARS auctions." *See* Stmt of Claim at ¶ 21. Each of these tasks did not involve the sale of new securities by Carilion.

Indeed, in the light of the MSRB's publicized efforts to protect municipal issuers, the notion that an issuer such as Carilion is not a customer of its underwriter-bank dealer under the facts alleged is absurd. The MSRB has repeatedly advised that its rules govern its members' activities with municipal issuers. The MSRB has interpreted its fair dealing rule, MSRB Rule G-17, to require its members to honor the commitments made to municipal issuers regarding distribution of the issuers' securities. A recent interpretive notice advises that:

> The MSRB is publishing this notice to remind dealers that the fair practice requirements of Rule G-17 also apply to their municipal securities activities with issuers of municipal securities.[56]

---

[55] MSRB Rule D-9 Interpretive Notice (October 24, 1978), attached as Exhibit K to Burge Decl.

[56] MSRB Rule G-17, September 29, 2009 Interpretive Notice, *Reminder Notice on Fair Practice Duties to Issuers of Municipal Securities*, attached as exhibit L to Burge Decl.

Surely the MSRB did not intend, as the Arbitration Defendants urge, to exclude issuers such as Carilion from the definition of "customer," and thereby deprive them of the protection of regulations that were carefully drafted for their benefit.  Any argument that Carilion was not a "customer" of the Arbitration Defendants — under either the MSRB or FINRA Rules — should be squarely rejected.

**D.    The forum selection clause does not control here, and it is not a waiver of Carilion's right to arbitrate.**

Arbitration Defendants also argue that Carilion waived its right as a FINRA customer to arbitrate its claims against the Arbitration Defendants by virtue of a Governing Law clause contained in the Broker-Dealer Agreement.  That clause provides:

> Section 5 **Governing Law.**  This Agreement shall be governed by and construed in accordance with the laws of the State of New York … The parties agree that all actions and proceedings arising out of this Agreement or any of the transactions contemplated hereby shall be brought in the United States District Court in the County of New York and that, in connection with any such action or proceeding, submit to the jurisdiction of, and venue in, such court.

The Arbitration Defendants' waiver argument lacks merit for four reasons.  First, a forum selection clause from a single, limited contract will not supplant an arbitration clause that applies to an entire broad transaction.  Second, a forum selection clause that does not even refer to arbitration does not demonstrate a clear intent to waive the right to arbitration.  Third, the Arbitration Defendants' interpretation creates an unnecessary conflict between the forum clause and FINRA Rule 12200, whereas a more logical interpretation can harmonize the two agreements.  Finally, the Arbitration Defendants violated their interpretation of this clause when they filed this suit in this Court, and not in the Southern District of New York, and they cannot obtain the equitable relief of an injunction when they have come to court with unclean hands.

1.      **A forum selection clause in a single contract will not supplant an arbitration clause that covers a broader agreement.**

The Governing Law clause in the Broker-Dealer Agreement is plainly not intended to cover all transactions between the parties. The terms of the Governing Law clause relate only to "this Agreement," which is defined to mean "the Broker-Dealer Agreement, Dated as of December 1, 2005." The clause applies only to "actions and proceedings arising out of this Agreement or any of the transactions contemplated hereby," and "hereby" is defined to refer to "the [Broker-Dealer] Agreement as a whole," not the broader ARS issuance.[57]

Notably, the other principal contract between the parties, the Bond Purchase Agreement, not only does not contain a forum selection clause, but contains an Applicable Law clause that conflicts with the Broker-Dealer Agreement. *See* Exhibits 3 & 4 to Memo. in Support, at 20 ("This Bond Purchase Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia."). So even among the two contracts signed by Carilion and the Arbitration Defendants, the parties signed irreconcilable governing law clauses. This undermines the Arbitration Defendants' suggestion that the Governing Law clause in the Broker-Dealer Agreement was meant to dictate a forum for all disputes between the parties.

A forum selection clause from a single, limited contract should not supplant an arbitration clause that applies to the entire broad transaction. FINRA Rule 12200 provides an arbitral forum for *every* activity in the *entire* bond transaction between the parties. This is particularly significant here, where, although the Arbitration Defendants did engage in undisclosed manipulations as Carilion's broker-dealer, Carilion complains extensively about the Arbitration Defendants' misrepresentations and omissions during the underwriting process. There can be no

---

[57] The Agreement defines "'herein,' 'hereof,' 'hereto,' and 'hereunder' and other words of similar import [such as 'hereby']" to refer to "the Broker-Dealer Agreement as a whole," and not to refer to the broader ARS transaction.

dispute that the Arbitration Defendants' violation of the duties they owed as underwriters pursuant to the Bond Purchase Agreement constitute a significant portion of Carilion's claim, and that Agreement contains no forum selection clause.

Courts have held that a forum selection clause in a single contract that is part of a broader contractual arrangement will not foreclose arbitration of claims relating to the broader contractual arrangement.

In *Personal Sec. & Safety Systems Inc. v. Motorola Inc*., 297 F.3d 388, 394-95 (5th Cir. 2002), the parties had a broad arbitration clause covering their entire relationship, including a Stock Purchase Agreement and a Product Development Agreement.   The party resisting arbitration held that this arbitration clause was superseded by a forum selection clause in the Stock Purchase Agreement, providing that "any suit or proceeding brought hereunder shall be subject to the exclusive jurisdiction of the courts located in Texas." *Id.* at 395.  The court held that this forum selection clause could not be read alone, however, but must be interpreted "in the context of the entire contractual arrangement and we must give effect to all of the terms of that arrangement." *Id.*   Continuing, the court held that:

> Given our conclusion that the arbitration provision in the Product Development Agreement applies to all claims related to the overall transaction, we must interpret the forum selection provision in the Stock Purchase Agreement in a manner that is consistent with the arbitration provision.
>
> Reading the two provisions together, it becomes clear that the forum selection clause does not require the parties to litigate all claims in Texas courts, nor does it expressly forbid arbitration of claims arising under the Stock Purchase Agreement. Instead, we interpret the forum selection clause to mean that the parties must litigate in Texas courts only those disputes that are not subject to arbitration-for example, a suit to challenge the validity or application of the arbitration clause or an action to enforce an arbitration award. Rather than covering all "disputes" or all "claims" like the arbitration provision in the Product Development Agreement, the forum selection clause confers "exclusive jurisdiction" on Texas courts only with respect to "any suit or proceeding." This

limitation suggests that the parties intended the clause to apply only in the event of a non-arbitrable dispute that must be litigated in court.

Thus, read together with the arbitration provision, the forum selection clause in the Stock Purchase Agreement does not operate to bar arbitration of disputes where otherwise required by contract.[58]

As in *Motorola*, here, the parties have an arbitration agreement [Rule 12200] covering all "disputes" and a Governing Law clause in but one of multiple contracts that make up the parties' agreements covering "actions and proceedings."   In consdieration of the entire contractual arrangement between Carilion and the Arbitration Defendants, this court should interpret the Governing Law clause consistently with FINRA Rule 12200, and hold that the Governing Law clause applies only in the event of a non-arbitrable dispute that must be litigated in court.

## 2.    A waiver of arbitration must be explicit.

Even if Carilion's claims arose exclusively out of the Broker-Dealer Agreement, for this later agreement to revoke an earlier agreement to arbitrate, the waiver must be explicit.[59]   The Governing Law clause here contains narrow language, dictating only that any dispute regarding the Broker-Dealer Agreement "shall be brought" in the Southern District of New York, and makes no reference to arbitration at all.   A similar forum selection clause in an agreement between the parties in *WVUH* – requiring that "all actions and proceedings arising out of this

---

[58] *Pers. Sec. & Safety Sys. Inc. v. Motorola Inc.*, 297 F.3d 388, 395-96 (5th Cir. 2002).  *See also Kvaerner ASA v. Bank of Tokyo-Mitsubishi, Ltd.*, 210 F.3d 262 (4th Cir. 2000) (a provision in a construction contract requiring that plaintiffs "irrevocably submit to the jurisdiction of any Federal court sitting in the State of New York, United States of America in any action or proceedings arising out of or relating to this Guaranty" was not inconsistent with the parties arbitrating disputes relating to the broader contractual arrangement).

[59] *See, e.g., Bank Julius Baer & Co., Ltd. V. Waxfield Ltd.*, 424 F.3d 278, 284 (2d Cir. 2005) ("[W]e cannot say that the Forum Selection Clause, which does not even mention arbitration, either 'specifically precludes' arbitration or contains a 'positive assurance' that this dispute is not governed by the Arbitration Agreement."); *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 75 (2d Cir. 1997) ("The Guaranty does not mention the Agreement-much less its arbitration clause—and the Guaranty's provisions as to jurisdiction, venue, and waiver of moratorium and stay laws do not constitute the kind of clear and specific waiver required to defeat the express arbitration provision in the Agreement.").

Broker–Dealer Agreement and any of the transactions contemplated hereby shall be brought in the County of New York and, in connection with any such action or proceeding, [the parties] submit to the jurisdiction of, and venue in, such County"[60] – was insufficient to overcome the parties' agreement to arbitrate under FINRA Rule 12200.

### 3. The Arbitration Defendants' reading of the forum selection clause creates an unnecessary conflict.

The Arbitration Defendants' arguments create an unnecessary conflict between the Governing Law clause and FINRA Rule 12200. Courts endeavor to give each agreement between the parties effect and to give deference to arbitration provisions.[61] The Fourth Circuit has held that courts should apply "the federal policy favoring arbitration when interpreting [Rule 12200], generously construing the parties' intentions as to issues of arbitrability and resolving any ambiguities as to the scope of the arbitration clause in favor of arbitration."[62]

By signing the Broker-Dealer Agreement, Carilion agreed: (a) to bring any judicial action arising out of that Agreement in the Southern District of New York, if it elected to pursue its claims in court and (b) to bring any action to compel arbitration or enforce an award arising out of that Agreement in the Southern District of New York.[63] This interpretation of the Governing Law clause harmonizes the provisions and allows for both agreements to be given effect.

---

[60] *UBS Fin. Services, Inc.*, 660 F.3d at 654. Both forum selection clause cases cited by Arbitration Defendants, *Applied Energetics* and *Biremis Corp.*, contained much more specific language mandating that actions must be "adjudicated" in a court in New York or granting "exclusive jurisdiction" to New York courts, language that is not present in the forum selection clause here.

[61] "Under our cases, if there is a reading of the various agreements that permits the Arbitration Clause to remain in effect, we must choose it." *Bank Julius*, 424 F.3d at 284.

[62] *Waterford Inv. Services, Inc. v. Bosco*, 11-2103, 2012 WL 2354453 (4th Cir. June 21, 2012) (citations omitted). *See also Wash. Square Secs., Inc. v. Aune*, 385 F.3d 432, 436 (4th Cir.2004) (An order to arbitrate should not be denied "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the stated dispute.") (internal citations omitted).

[63] This is an interpretation of purportedly conflicting arbitration and forum selection clauses that several courts have reached. *Bank Julius*, 424 F.3d at 284-285; *Personal Sec. & Safety Systems Inc*., 297 F.3d at 395-96; *Kvaerner,* 210 F.3d at 267.

This interpretation of the forum selection clauses is also supported by the fact that FINRA and the SEC strongly discourage pre-dispute venue and forum clauses:

> Section 21(f)(4) of the NASD Rules of Fair Practice, as amended, prohibits the use in any customer agreement of any language that (a) limits or contradicts the rules of the NASD or any other self-regulatory organization; (b) *limits the ability of a party to file a claim in arbitration*; or (c) limits the ability of the arbitrators to make an award under the arbitration rules of a self-regulatory organization and applicable law. The NASD Code of Arbitration Procedure sets forth the applicable authority and procedures in these areas.

> \* \* \*

> Similar compliance problems are raised by provisions that attempt to limit the courts before whom awards may be confirmed or limit the role of arbitrators. Indeed, *the use of a governing law clause or other clause anywhere within a customer agreement that thwarts any NASD arbitration provision will be deemed violative.*[64]

> ------------------

> The proposal also prohibits SRO members from having agreements with customers that limit or contradict the rules of any SRO or limit the ability of a party to file any claim in arbitration or limit the ability of the arbitrators to make any award.[65]

If the forum selection clause is interpreted to bar arbitration, the Arbitration Defendants would be in violation of the rules of their own Self-Regulatory Organization, as well as the SEC. Accordingly, it is more reasonable to interpret the clause consistently with the customer's right to arbitrate, and assume that the Arbitration Defendants did not intentionally violate FINRA and SEC rules.

### 4.    Finally, the Arbitration Defendants themselves have not abided by the forum selection clause.

The Arbitration Defendants claim that this dispute is governed by the forum selection clause is further undermined by the fact that they have brought this preliminary injunction action

---

[64] FINRA Notice 95-16, attached as exhibit M to Burge Decl. (emphasis added).
[65] S.E.C. Release No. 34-26805, attached as exhibit N to Burge Decl., at *22

in the Eastern District of Virginia, rather than the forum purportedly mandated by the Broker-Dealer Agreement.  The reason for bringing the suit here is obvious: Arbitration Defendants are forum-shopping, as they recognize that most of their arguments have been rejected by the Second Circuit.  But it is surely telling that in their waiver motion the Arbitration Defendants seek to enforce a forum selection clause they have not themselves abided by.

An injunction is an equitable remedy, and courts are clear that a party seeking equitable relief from a court must not come to court with unclean hands.[66]  Here, the Arbitration Defendants have flagrantly violated the very forum selection clause they seek to enforce by filing suit not in the United States District Court for the County of New York, where they surely recognize that their claims about the definition of "customer" will be barred by precedent, but in this Court.  Having come to this Court with unclean hands on this issue, they are not entitled to the equitable relief of an injunction based on the forum selection clause they have violated.

**E.     The balance of hardships does not decidedly favor the Arbitration Defendants.**

To obtain a preliminary injunction, the Arbitration Defendants must show not only that they are likely to suffer irreparable harm, but that "the balance of equities tips in [their] favor." *Dewhurst*, 649 F. 3d at 290.  In the present case, Carilion concedes that courts have recognized that parties are harmed when they are forced to arbitrate claims that are not eligible for arbitration.  Even so, the harm to Carilion if this arbitration is stayed is substantial and is not outweighed by any harm the Arbitration Defendants may suffer if arbitration proceeds.

---

[66] *Plant v. Merrifield Town Ctr. Ltd. P'ship*, 711 F. Supp. 2d 576, 596 (E.D. Va. 2010) ("[W]ith respect to the unclean hands defense, the law of Virginia and the federal common law are the same: no party asserting an equitable claim or an equitable defense may himself or herself be 'tainted with inequitableness or bad faith relative to the matter in which he [or she] seeks relief, however improper may have been the behavior' of the other party.") (quoting *Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co.,* 324 U.S. 806 (1945)).

Parties such as the Arbitration Defendants routinely undertake "herculean efforts to avoid resolution of disputes through arbitration." *Smoothline Ltd. v. N. Am. Foreign Trading Corp.*, 249 F.3d 147, 148 (2d Cir. 2001). The Fourth Circuit has recognized that arbitration's "chief benefits lie in providing speedy and inexpensive trials before specialists and in easing the workload of the courts." *Sverdrup Corp. v. WHC Constructors, Inc.*, 989 F.2d 148, 152 (4th Cir. 1993). It is because of the public policy favoring "speedy and efficient decisions not subject to delay and obstruction in the courts" that federal courts, including the Fourth Circuit, recognize a "heavy presumption in favor of arbitrability." *Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co.*, 867 F.2d 809, 812 (4th Cir. 1989). Carilion has a right, as a customer of a FINRA member, to less expensive resolution of its claims against Arbitration Defendants through arbitration. Further delay through an injunction will frustrate Carilion's right to speedy arbitration of its claims, and undermine the federal presumption in favor of arbitration.

This Court may take counsel from the Southern District of New York's opinion in *UBS Financial Services, Inc. v. West Virginia University Hospitals, Inc.*,[67] a case in which UBS sought to enjoin another ARS issuer from proceeding with a FINRA arbitration. The court held that it was not persuaded that "the balance of hardships tips decidedly in UBS' favor. Rather the Court finds that further delay of these proceedings would frustrate Defendants' right to a speedy arbitration of their claims. This hardship is not outweighed by any potential hardship to UBS."[68]

**F.    An injunction in favor of the Arbitration Defendants would not be in the public interest.**

In the FAA, Congress recognized a public policy in favor of arbitration, and expressed a strong intent "to move the parties to an arbitrable dispute out of court and into arbitration as

---

[67] *UBS Fin. Services, Inc. v. W. Virginia Univ. Hospitals, Inc.*, 760 F. Supp. 2d 373 (S.D.N.Y. 2011) *aff'd in part, vacated in part on other grounds*, 660 F.3d 643 (2d Cir. 2011).
[68] *UBS Fin. Services, Inc. v. W. Virginia Univ. Hospitals, Inc.*, 760 F. Supp. 2d at 379.

474576v.1

quickly and easily as possible."[69]   That policy and Congress's purpose is frustrated when parties endeavor to delay and increase the expense of arbitration by costly judicial disputes over arbitrability.   Further, there is a strong federal policy in favor of the conclusive effect of prior judgments.   "To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions."[70]   Those policy interests are undermined when parties relitigate previously decided issues in multiple forums, hoping for a different outcome in front of a new decision maker.   And the public interest is surely not served when a party ignores the forum selection clause it is seeking to enforce, and files suit in another district to try and dodge the preclusive effect of the prior decisions.

## CONCLUSION

For the above stated reasons, the Arbitration Defendants' motion for preliminary injunction should be denied.

---

[69] *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 22 (1983).
[70] *Montana v. U. S.*, 440 U.S. 147, 153-54 (1979).

474576v.1

June 28, 2012                          Respectfully submitted,


                                        _/s/ James R. Swanson_____
                                       James R. Swanson, *Pro hac vice*
                                       jswanson@fishmanhaygood.com
                                       Joseph C. Peiffer, *Pro hac vice*
                                       jpeiffer@fishmanhaygood.com
                                       Jason W. Burge, *Pro hac vice*
                                       jburge@fishmanhaygood.com
                                       FISHMAN HAYGOOD PHELPS
                                         WALMSLEY WILLIS & SWANSON, L.L.P.
                                       201 St. Charles Avenue, Suite 4600
                                       New Orleans, Louisiana 70170-4600
                                       Telephone:  504/586-5252
                                       Facsimile:  504/586-5250


                                       Patrick T. Fennell (VSB #: 40393)
                                       CRANDALL & KATT
                                       366 Elm Avenue, S.W.
                                       Roanoke, Virginia 24016
                                       Telephone:  540/342-2000
                                       Facsimile:  540/345-3527
                                       pfennell@crandalllaw.com

                                       *Counsel for Carilion Clinic*

31

<u>Certificate of Service</u>

I hereby certify that on June 28, 2012, I electronically filed the foregoing Memorandum in Opposition to Motion for Preliminary Injunction with the Clerk of Court using the CM/ECF system, which will send notification of such filing (NEF) to the following:

Hugh McCoy Fain, III (VSB No. 26494)
hfain@spottsfain.com
Edward Everett Bagnell, Jr. (VSB No. 74647)
ebagnell@spottsfain.com
SPOTTS FAIN PC
411 E Franklin Street
Suite 600
Richmond, VA 23219
Telephone: (804) 697-2000
Facsimile: (804) 697-2177
*Counsel for USB FINANCIAL SERVICES INC.,*
*And CITIGROUP GLOBAL MARKETS, INC.*

SIMPSON THACHER & BARTLETT LLP
Jonathan K. Youngwood (*pro hac vice*)
(jyoungwood@stblaw.com)
425 Lexington Avenue
New York, NY 10017
Telephone: (212) 455-2000
Facsimile: (212) 455-2502
*Attorney for Plaintiff UBS Financial Services Inc.*

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Jay Cohen (*pro hac vice*)
(jaycohen@paulweiss.com)
Julie E. Fink (*pro hac vice*)
(jfink@paulweiss.com)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
*Attorney for Plaintiff Citigroup Global Markets Inc.*

32

By: /s/ Patrick T. Fennell
Patrick T. Fennell (VSB # 40393)
CRANDALL & KATT
366 Elm Avenue, S.W.
Roanoke, Virginia 24016
Telephone:  540/342-2000
Facsimile:  540/400-0616
pfennell@crandalllaw.com
*Attorney for Carilion Clinic*

474576v.1