IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division


UBS FINANCIAL SERVICES INC.,

and

CITIGROUP GLOBAL MARKETS, INC.,
                          Plaintiffs,

v.                                                  Civil Action No. 3:12cv424-JAG

CARILION CLINIC,
                          Defendant.

## <u>MEMORANDUM OPINION</u>

This matter is before the Court on the plaintiffs' motion for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65.  In the dispute that underlies this litigation, the defendant, Carilion Clinic ("Carilion"), contends that UBS Financial Services, Inc. ("UBS") and CitiGroup Global Markets, Inc. ("Citi") fraudulently induced Carilion to issue over $308 million in municipal bonds.

On February 11, 2012, Carilion initiated arbitration against UBS and Citi with the Financial Industries Regulation Authority ("FINRA").  The plaintiffs seek an injunction enjoining that arbitration.  Their argument is two-fold.  First, they argue that Carilion is not their customer and, therefore, has no right to arbitrate before FINRA.  Second, they argue that Carilion effectively waived its right to arbitration by agreeing to a mandatory forum selection clause, which requires the dispute to be litigated in the United States District Court in the Southern District of New York.

For the reasons stated herein, the Court finds that Carilion is a customer of UBS and Citi based on the various services that Carilion purchased from the plaintiffs in exchange for compensation. Additionally, the Court finds that the forum selection clause does not act as a waiver of Carilion's right to arbitrate due to the language of the agreement, the federal preference in favor of arbitration, and the plaintiffs' knowledge of FINRA's policy for choosing the site of arbitration. The plaintiffs, therefore, are unlikely to succeed on the merits. The plaintiffs also fail to show that they will suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in their favor, or that a preliminary injunction is in the public interest. Accordingly, the motion for a preliminary injunction will be denied.

## I. **Background**

Carilion is a not-for-profit healthcare organization that operates eight hospitals in western Virginia. UBS is a Delaware corporation with its principal place of business in New Jersey. Citi is a New York corporation with its principal place of business in New York. Both UBS and Citi are global financial service providers and members of FINRA. FINRA is a quasi-governmental organization that regulates brokerage firms and exchange markets and arbitrates claims against FINRA members that arise out of their securities dealings. FINRA oversees more than 4,000 brokerage firms and has 20 offices throughout the United States. Members of FINRA agree to adhere to FINRA rules, including the requirement that they submit certain disputes to arbitration.

In 2005, Carilion sought funds to renovate and expand its medical facilities. To this end, Carilion entered into a business arrangement with UBS and Citi to raise $308.465 million. At the recommendation of UBS and Citi, Carilion decided to issue $74.24 million of bonds in the form of variable demand rate obligations ("VDRO"), which are long-term tax-exempt bonds whose interest rates generally reset on a daily, weekly, or monthly basis. Carilion issued the

remaining $234.225 million as auction rate securities ("ARS"). These ARS are the subject of the underlying dispute between the parties.

ARS are bonds for which the variable interest rate is determined through a periodic auction. At these auctions, current bond holders have the option to hold their shares at a given interest rate or make their shares available for sale. Potential investors then bid on the number of shares they wish to purchase and the minimum interest rate they will accept. The lowest rate for which all the available shares can be sold will become the new rate ("clearing rate") for the ARS. Only those investors who bid at or below the clearing rate receive shares. If, however, there are insufficient orders to cover all the available shares, the auction fails, and the interest rate reverts to a predetermined maximum rate. To prevent failed auctions, UBS and Citi had a policy of bidding in the auction when insufficient bids were submitted by investors. In other words, UBS and Citi allegedly supported the ARS market to ensure its continued existence as a viable option for security issuers. Consequently, UBS and Citi could increase the broker-dealer fees they collected.

The business arrangement between Carilion, UBS, and Citi was complex and encompassed several distinct services. UBS and Citi acted in four roles: (1) they advised Carilion on the best method of structuring the securities; (2) they acted as the underwriter of the ARS by purchasing all the shares and reselling them to investors at a markup; (3) they acted as the lead-broker dealer by administering the periodic auctions; and (4) they facilitated the creation of interest-rate swaps. This complex business relationship was memorialized and effectuated by two series of documents: the Underwriter Agreements provided for the creation of the securities and the plaintiffs' initial purchase of the ARS; the Broker-Dealer Agreements provided that UBS and Citi would run the periodic auctions. Notably, neither series of agreements contained an

arbitration clause. The Broker-Dealer Agreements contained a forum selection clause requiring all actions and proceedings arising out of the agreement to be filed in the United States District Court in the County of New York. (*See* Dk. No. 5, Ex. 8 13.)

In February 2008, the ARS market collapsed as a result of the global financial crisis. UBS and Citi decided to end their policy of propping up the ARS market, and the auctions began to fail. Carilion saw the interest rates on its ARS increase substantially and was forced to refinance its debt to avoid the higher interest payments, resulting in a loss of many millions of dollars. Carilion claims that it was unaware that the banks were propping up the ARS market, and would not have issued ARS had it known the policy.

In February 2012, Carilion initiated arbitration proceedings against UBS and Citi in FINRA. Although the parties did not expressly provide for arbitration in the written agreements, Carilion argues that it may submit the dispute to FINRA as a "customer" of UBS and Citi. In its arbitration complaint, Carilion alleges breach of fiduciary duty, fraud, negligent misrepresentation, violation of the Exchange Act, violation of the Virginia Securities Act, and violation of FINRA and Municipal Securities Rulemaking Board ("MSRB") duties.[1] The proceeding is being held in Richmond, Virginia. UBS and Citi contend that Carilion has no basis to compel arbitration in FINRA and now seek a preliminary injunction enjoining FINRA from proceeding with the case.

## II. Standard of Review

### A. *Preliminary Injunction*

A preliminary injunction is "an extraordinary remedy," one "to be granted only sparingly." *In re Microsoft Litig.*, 333 F.3d 517, 524 (4th Cir. 2003). Such relief is appropriate

---

[1] Carilion's ARS are considered municipal bonds because they were issued through the City of Roanoke.

when the plaintiffs establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in the plaintiffs' favor; and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346-47 (4th Cir. 2009), *vacated on other grounds*, 130 S.Ct. 2371 (2010). As the Fourth Circuit has explained, *Winter* requires that the plaintiffs make a clear showing they will likely succeed on the merits at trial. *Real Truth About Obama, Inc.*, 575 F.3d at 346. The party seeking the preliminary injunction bears the burden of proving that each factor supports granting relief. *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991).

### B. Enjoining Arbitration under the Federal Arbitration Act

The Federal Arbitration Act ("FAA") authorizes district courts to compel arbitration when a party has breached an agreement to arbitrate. *See* 9 U.S.C. § 4. While the FAA only explicitly empowers courts to compel arbitrations, district courts in this circuit have also routinely enjoined proceedings when the parties never agreed to submit their disputes to arbitration. *See, e.g., Morgan Keegan & Co. v. Louise Silverman Trust*, No. JFM-11-2533, 2012 U.S. Dist. LEXIS 3870 (D. Md. Jan. 12, 2012); *Waterford Inv. Servs. v. Bosco*, No. 3:10cv548, 2011 U.S. Dist. LEXIS 96046 (E.D. Va. July 29, 2011); *Royal Alliance Assocs. v. Branch Ave. Plaza, L.P.*, 587 F. Supp. 2d 729 (E.D. Va. 2008). When considering a motion to enjoin arbitration, the Court may only consider whether arbitration is a proper forum for the underlying dispute; if arbitration is appropriate, all procedural issues are left to the determination of the arbitrator. *See Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002); *Dockser v. Schwartzberg*, 433 F.3d 421, 425 (4th Cir. 2006).

5

### III. Discussion

#### A. *Likelihood of Success on the Merits*

##### i. *Carilion is a Customer of UBS and Citi*

UBS and Citi provided multiple financial services for Carilion in exchange for payment. Carilion is, under the plain meaning of the term, a "customer" of UBS and Citi. Every court that has addressed this specific issue has come to the same conclusion. In this respect, FINRA is the proper forum for the parties' underlying dispute.

Arbitration, although favored by federal law and the Supreme Court, cannot be compelled on a party who never consented to it. *Howsam*, 537 U.S. at 83. FINRA rules require arbitration in two situations: (1) pursuant to a written contract or (2) when requested by a customer of a FINRA member. *See* FINRA Code of Arbitration Procedure for Customer Disputes ("FINRA R.") 12200. Here, the instant parties never agreed in writing to arbitrate. Carilion contends that it is a customer of UBS and Citi, who are bound by the FINRA rules, and can, therefore, compel arbitration. UBS and Citi argue that Carilion is an issuer of securities, not a customer. They claim the parties entered into an arms-length transaction between sophisticated actors—a relationship FINRA did not intend to regulate.

FINRA's rules define "customer" in the negative, as an entity that "shall not include a broker or dealer." FINRA R. 12100.[2] Courts, including the Fourth Circuit, have not settled on a precise definition of "customer" under FINRA rules. This uncertainty surrounding the term has resulted in frequent litigation. In resolving such cases, the Fourth Circuit emphasizes that due regard must be given to the federal policy favoring arbitration. *Washington Square Secs., Inc. v.*

---

[2] UBS and Citi urge the Court to utilize the definition of "customer" provided by the MSRB rules. Those rules are inapplicable. Although the MSRB rules apply to disputes concerning municipal securities, MSRB Rule G-35 states that, for the purposes of FINRA arbitration, FINRA's Arbitration Code applies. *See* Municipal Securities Rulemaking Board Rule G-35.

*Aune,* 385 F.3d 432, 435-36 (4th Cir. 2004) ("[A]mbiguities as to the scope of the arbitration clause itself must be resolved in favor of arbitration.") (quoting *Volt Info. Sciences, Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.,* 489 U.S. 468, 475-76 (1989)). In *Washington Square,* the Fourth Circuit affirmed the lower court's denial of a preliminary injunction. The plaintiff in that case, a NASD[3] member, sought to enjoin arbitration initiated by a group of investors who purchased securities through a third party. The plaintiff argued that the investors lacked the necessary privity to qualify as "customers" under NASD rules. The Fourth Circuit found that the term "customer" was ambiguous and construed it in favor of arbitration. Finding the NASD rules susceptible to an interpretation covering the investors' dispute, the court affirmed the denial of a preliminary injunction. *See Washington Square Secs.,* 385 F.3d at 436.

The preference for arbitration is not without limit, however. This Court has enjoined arbitration when the alleged customer cannot establish a direct relationship with the FINRA member. For example, this Court held that a successor-in-interest cannot be compelled to arbitrate by the customers of its predecessor. *Royal Alliance Assoc., Inc. v. Branch Avenue Plaza, L.P.,* 587 F. Supp. 2d 729, 737 (E.D. Va. 2008). A party is also not a customer if it had only attenuated contacts with a FINRA member. *See Morgan Keegan & Co. v. Johnson,* No. 2:11CV502, 2011 WL 7789796, at *6 (E.D. Va. Dec. 22, 2011). These cases, taken together with *Washington Square,* suggest that, in the Fourth Circuit, FINRA arbitration will be enjoined only when the aggrieved party cannot show that it procured some financial services directly from the FINRA member. If, however, the business relationship is subject to an interpretation falling within FINRA's Customer Code, arbitration may proceed.

---

[3] The National Association of Securities Dealers ("NASD") is the predecessor to FINRA. Its Customer Code is, in all ways relevant, identical to FINRA's.

The specific question for this Court is whether, given the various functions performed by UBS and Citi, Carilion is a customer under FINRA's rules. The plain meaning of the term "customer" is generally understood to be "one that purchases some commodity or service." *See Webster's Third New International Dictionary* 559 (3d ed. 2002). In this case, Carilion clearly paid UBS and Citi for a variety of financial services. First, as the ARS underwriters, UBS and Citi purchased the securities from Carilion at a discounted rate and re-sold them to investors at a markup. Second, Carilion paid over $500,000 annually to the plaintiffs for administering the ARS auctions. (Defendant's Memo in Opposition ("Def's Memo Opp") 5 (Dk. No. 27).) Third, UBS and Citi advised Carilion to structure their debt in the form of ARS, and as a consequence, were able to reap greater profit.[4] Specifically, Citi told Carilion that "ARS represent one of the most efficient sources of tax exempt funding. The market for these bonds is liquid, homogenous and competitive, resulting in low funding costs." (Vaughan Decl., (Dk. No. 27, Ex. C) 3.) Finally, UBS and Citi facilitated the creation of interest-rate swaps by selling the swaps, as well as providing on-going advice, monitoring, and advisory services regarding the bonds and the swaps after the issuance. (Def's Memo Opp. 4-5.) In short, UBS and Citi received compensation for providing numerous services to Carilion. As a result, the Court finds that Carilion is a customer for purposes of FINRA arbitration.

While this issue is one of first impression in the Fourth Circuit, other courts have consistently held that an issuer of municipal securities who purchased financial services from a FINRA member is a customer under FINRA rules. In a virtually identical case, *UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc.*, UBS acted as the underwriter of municipal bonds issued as

---

[4] UBS and Citi earned a remarketing fee of 25 basis points (0.25%) for acting as the lead broker-dealer of the ARS. In comparison, they only earned 7 basis points (0.07%) for acting as the broker-dealer of the traditional VRDO securities. (Stmt. of Claim ¶ 25 (Dk. No. 5, Ex. 1).)

ARS. 760 F. Supp. 2d 373 (S.D.N.Y. 2011). When the ARS market collapsed, West Virginia University Hospitals, Inc. ("the hospital") initiated arbitration proceedings in FINRA. UBS filed a suit in the Southern District of New York seeking to enjoin the FINRA proceedings because the hospital was not a customer. The court ultimately held that a "customer" need not receive impartial advice from a FINRA member in order to qualify for FINRA arbitration. *Id.* at 379. It noted: "[W]ith the ever-increasing complexities of dealing in financial products and their derivatives, it is not uncommon for these institutions to play more than one role in a multi-faceted transaction." *Id.* The court was persuaded by the fact that UBS not only acted as underwriter for the ARS, but also proposed the use of ARS, proposed the use of interest-rate swaps, and participated in the auctions. *Id.* On appeal, the Second Circuit declined to decide whether, as a categorical matter, an issuer qualifies as a customer. *W. Va. Univ. Hosps.,* 660 F.3d at 650. Rather, the court affirmed the denial of a preliminary injunction on the grounds that the parties had created a customer relationship when UBS ran the ARS auctions for a fee. *Id.*; *see also J.P. Morgan Secs., Inc. v. La. Citizens Prop. Ins. Corp.,* 712 F. Supp. 2d 70, 79 (S.D.N.Y. 2010) (holding that an issuer of ARS is a customer under similar facts). More recently, the Northern District of California came to the same conclusion. *See Ross Sinclair & Assoc. v. Premier Senior Living, LLC,* No. 11cv5104YGR, 2012 U.S. Dist. LEXIS 89229, at *7 (N.D. Cal. June 27, 2012) ("Given that the definition of 'customer' is written broadly enough to encompass the relationship here . . . the Court finds that arbitration pursuant to FINRA rule 12200 must be compelled."). No court has taken the opposite view: that an issuer of securities that purchased services from a broker-dealer is not a customer.

Furthermore, FINRA itself seems to have rejected the plaintiffs' argument. When the Director of FINRA considered these exact arguments in a motion to dismiss, he summarily

9

denied the motion. (*See* Burge Decl. (Dk. No. 27, Ex. E).)  The Second Circuit took judicial note

of this fact in affirming the lower court's decision in *W. Va. Univ. Hosps.,* 660 F.3d at 652

("FINRA appears to have rejected the interpretation of FINRA's rules advanced by UBS . . . .").

Moreover, the NASD (the predecessor of FINRA) released a policy statement providing: "An

issuer of securities should be considered a public customer of a member firm where a dispute

arises over a proposed underwriting."[5]  *See Patten Sec. Corp. v. Diamond Greyhound &*

*Genetics, Inc.,* 819 F.2d 400, 406 (3d Cir. 1987).  All together, FINRA has expressed a broad

view of the scope of its Arbitration Code.

In sum, Carilion paid a substantial amount of money to the plaintiffs in exchange for

various financial services.  Other courts have consistently found a customer relationship under

similar circumstances.  Given the federal preference in favor of arbitration, the Court holds that

UBS and Citi are unlikely to succeed on the merits of their argument that Carilion is not a

customer.

### ii. Forum Selection Clause

As stated, contained within the Broker-Dealer Agreements is a forum selection clause:

> The parties agree that all actions and proceedings arising out this Agreement or any of the
> transactions contemplated hereby shall be brought in the United States District Court in
> the county of New York and, in connection with any such action or proceeding, submit to
> the jurisdiction of, and venue in, such court.

(Dk. No. 5, Ex. 8 13.)  UBS and Citi contend that this clause acts as a waiver of Carilion's right

to arbitrate in FINRA.  The Court is mindful that it should give effect to forum selection clauses

unless they are unreasonable.  *See The Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 10 (1972);

*Albemarle Corp. v. AstraZeneca UK Ltd.,* 628 F.3d 643, 649 (4th Cir. 2010).  If the clause were a

---

[5] This policy statement is no longer binding since FINRA has replaced the NASD and the New
York Stock Exchange's arbitration functions.

waiver of arbitration, this Court would declare the pending arbitration contrary to the parties' intent and enjoin the proceeding. Here, however, the Court finds the venue provision is not a waiver, and declines to enjoin.

For several reasons, the forum selection clause at issue should not be read as a waiver of the right to arbitrate. First, the Court takes note that the FAA requires any ambiguities in a contract to be resolved in favor of arbitration. *See* 9 U.S.C. § 2; *Volt Info. Sciences, Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 475-76 (1989). While the intent of the parties is dispositive, such intent must be "generously construed as to issues of arbitrability." *Washington Square Sec., Inc.*, 385 F.3d at 436 (citation omitted). It is through this lens that the Court must construe the language of the Broker-Dealer Agreements. Accordingly, the Court will favor an interpretation of the provision that permits arbitration to proceed.

Second, the language of the forum selection clause is susceptible to an interpretation favoring arbitration. It provides that "all actions and proceedings" shall be brought in the United States District Court in the county of New York. The clause does not directly address arbitration. Importantly, before signing the agreements at issue, the plaintiffs had already agreed to arbitrate disputes with customers by virtue of their membership in FINRA. If they had intended to contract out of that obligation, and to overcome the federal preference in favor of arbitration, they could and should have included an explicit term in their written agreement. Furthermore, when confronted with both a broad arbitration agreement, such as the FINRA Arbitration Code, and a narrower forum selection clause solely present in a portion of the written documents, the Court should give effect to the broader provision. *See Personal Sec. & Safety Sys. Inc. v. Motorola Inc.*, 297 F.3d 388, 396 (5th Cir. 2002) ("[T]he forum selection clause confers 'exclusive jurisdiction' on Texas courts only with respect to 'any suit or proceeding.'

This limitation suggests that the parties intended the clause to apply only in the event of a non-arbitrable dispute that must be litigated in court.").

Finally, UBS and Citi, as members of FINRA, had notice of FINRA's own forum selection practices. Generally, the Director of FINRA will schedule arbitration in the location "closest to the customer's residence at the time of the events giving rise to the dispute." FINRA R. 12213(a)(1). As such, the plaintiffs' reading conflicts with FINRA's practices with respect to scheduling arbitration. The remaining purpose of the forum selection clause, therefore, would be to keep any disputes out of FINRA and in court. As mentioned previously, if the parties had intended that outcome, they could have included an explicit waiver of FINRA arbitration, instead of relying on the more ambiguous language of the Broker-Dealer provision.

Given that the forum selection clause is only present in one of the agreements and contains ambiguous language relative to arbitration, this Court will not construe the clause as a waiver of Carilion's right to arbitrate in FINRA. UBS and Citi knew of their obligation to arbitrate disputes with their customers. Having concluded that Carilion is a customer, this Court will not read the forum selection clause as a waiver of Carilion's rights under FINRA's Customer Code.[6] Accordingly, UBS and Citi are unlikely to succeed on the merits of their argument that the venue provision precludes arbitration.

---

[6] One final issue is whether, despite having concluded that the forum selection clause is not a waiver, this case must be transferred to the Southern District of New York. The defendant has not raised the issue of venue; however, the Court would decline to transfer this case because the Eastern District of Virginia is the only court with the authority to enjoin FINRA arbitration in Richmond, Virginia. Courts are split on whether 9 U.S.C. § 4 requires an order compelling or enjoining arbitration to be issued by a federal court in the district where the arbitration is to take place. *Compare Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lauer*, 49 F.3d 323, 328 (7th Cir. 1995), *with Textile Unlimited, Inc. v. A.BMH & Co.*, 240 F.3d 781 (9th Cir. 2001). While the Fourth Circuit has not addressed this issue, this Court has noted that the Fourth Circuit would likely follow the approach of the Seventh Circuit in *Lauer*. *Am. Int'l Specialty Lines Ins. Co. v. A.T. Massey Coal Co., Inc.*, 628 F. Supp. 2d 674, 683 (E.D. Va. 2009) (Payne, J.). Importantly,

### B. *Irreparable Harm*

To obtain a preliminary injunction, a plaintiff must also make a "clear showing that it is likely to be irreparably harmed absent preliminary relief." *Real Truth About Obama, Inc.*, 575 F.3d at 347 (citation omitted).  This analysis does not employ a balancing test; the plaintiff will not succeed merely by showing that that the harm to the plaintiff would outweigh the harm to the defendant.  *Id.*  Instead, the plaintiff must show that it would likely suffer irreparable harm before a decision on the merits can be rendered. *Winter*, 129 S. Ct. at 375 (citing 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948.1, p. 139 (2d ed. 1995)).

In this case, the plaintiffs argue that they will incur unnecessary expense if they are forced to arbitrate Carilion's action before FINRA.  Specifically, they contend that all of Carilion's claims are barred by the applicable statute of limitations but that FINRA's rules would nonetheless require the parties to engage in a costly discovery process before UBS and Citi could file a motion to dismiss.[7]  The Court agrees that forcing a party to defend an arbitration complaint when it never agreed to do so constitutes irreparable harm *per se.  See Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 129 (2d Cir. 2003); *Morgan Keegan & Co. v. Louise Silverman Trust,* No. JFM-11-2533, 2012 WL 113400, at *5 (D. Md. Jan 12, 2012).  Yet, UBS and Citi agreed to arbitrate disputes with their customers by virtue of their membership in FINRA.  Having concluded that Carilion has a right to bring its claim in FINRA, any harm

---

the Southern District of New York has come to the same conclusion. *See Kipany Prods., Ltd. v. RMH Teleservices, Inc.*, No. 97 CIV. 7599 (LMM), 1997 WL 706445, at *1 (S.D.N.Y. Nov. 13, 1997).  In its discretion, this Court will not transfer the case to the Southern District of New York where the action would either be dismissed for improper venue or transferred back to the Eastern District of Virginia.

[7] FINRA rules permit a pre-arbitration motion to dismiss under two circumstances: (1) when the non-moving party has previously settled its dispute, and (2) when the moving party was not associated with the securities or conduct at issue. *See* FINRA R. 12504(6).

13

suffered by the plaintiffs is a result of their obligations under FINRA rules. The plaintiffs cannot make a clear showing that they are likely to be irreparably harmed absent preliminary relief.

## C. *Balance of the Equities*

Third, a plaintiff seeking a preliminary injunction must demonstrate "that the balance of equities tips in his favor." *Real Truth About Obama*, 575 F.3d at 346. Absent preliminary relief, UBS and Citi would incur the costs of defending Carilion's arbitration before FINRA. These costs could be substantial given FINRA's policy of limiting pre-arbitration motions to dismiss. *See* FINRA R. 12504(a)(1) ("Motions to dismiss a claim prior to the conclusion of a party's case in chief are discouraged in arbitration.") Carilion also delayed initiating arbitration for four years after the collapse of the ARS market. On the other hand, Carilion has a right to bring its claim before FINRA because it is a customer of UBS and Citi. A preliminary injunction would deny Carilion's right to a speedy and less expensive forum to adjudicate its underlying dispute with the plaintiffs. Because arbitration is a "highly favored mechanism for dispute resolution," equity favors permitting Carilion's arbitration to proceed. In sum, the plaintiffs have failed to show that the balance of the equities decidedly tips in their favor. *Accord W. Va. Univ. Hosps., Inc.,* 760 F. Supp. 2d at 379.

## D. *Public Interest*

The final factor in the preliminary injunction analysis is whether public policy favors granting preliminary relief. As the Supreme Court stated in *Winter*, "courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 129 S. Ct. at 376-77. There is a strong federal policy favoring arbitration. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-5 (1983) ("The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of

14

arbitrable issues should be resolved in favor of arbitration."). But, it is equally well-established that the policy favoring arbitration has limits; a party cannot be compelled to arbitrate a dispute it did not agree to submit to arbitration. *See Volt Info. Sci., Inc.*, 489 U.S. at 478; *AT&T Techs., Inc.*, 475 U.S. at 648. As UBS and Citi correctly point out, public policy favors giving effect to the parties' intent. *See, e.g., Local Union 2426 v. United Mine Workers*, 864 F. Supp. 545, 554 (S.D. W. Va. 1994) (holding that public policy favors enforcing the parties' intent with respect to arbitration). This issue is, therefore, resolved by looking to whether the parties agreed to arbitrate. Having concluded that UBS and Citi agreed to arbitrate disputes with their customers, and that Carilion qualifies as a customer, public policy favors giving effect to the parties' intent by allowing arbitration to proceed.

## IV. Conclusion

This case presents two primary issues: (1) whether Carilion has a right to arbitrate its claims against UBS and Citi; and (2) whether Carilion waived that right by agreeing to a forum selection clause. Ultimately, Carilion is a customer because it purchased services from UBS and Citi for a fee. Likewise, the terms of the forum selection clause must be construed generously in favor of arbitration. These terms do not unambiguously reflect the parties' intent to litigate all disputes arising out of their business transactions. Members of FINRA, and their customers, expect to arbitrate disputes in a location chosen by the Director of FINRA. It is plausible that Carilion did not intend to surrender that right by agreeing to the forum selection clause in the Broker-Dealer Agreements. This uncertainty must be resolved in favor of arbitration. The forum selection clause, therefore, will not be read as a waiver.

For the reasons set forth above, the Court will deny the plaintiffs' motion for a preliminary injunction.

The Court will enter an appropriate order.

Date: July 30, 2012
Richmond, VA

_____ /s/
John A. Gibney, Jr.
United States District Judge